IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

TOMIE DOTY,                              )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )       Case No.
                                        )       12-5003-CV-SW-REL-SSA
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Tomie Doty seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) improperly finding

that plaintiff's labral tear of the right shoulder was a non-severe impairment, (2) formulating a

residual functional capacity based on no medical evidence, and (3) discrediting plaintiff's

subjective complaints without identifying the inconsistencies in the record. I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.    BACKGROUND

On January 11, 2010, plaintiff applied for disability benefits alleging that he had been

disabled since December 31, 2006.[1] Plaintiff's disability stems from anxiety, depression,

paranoia, antisocial behavior, and problems with his legs, right arm and shoulder. Plaintiff's

application was denied on March 17, 2010. On August 4, 2011, a hearing was held before an

_____

[1]In his application, plaintiff alleged disability since May 14, 2007 (Tr. at 129, 133).
However, in his Disability Report plaintiff reported that he stopped working on December 31,
2006 "because of my condition" (Tr. at 165). Because the ALJ's decision finding plaintiff not
disabled is affirmed, this discrepancy will not be discussed.

Administrative Law Judge.  On September 23, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On November 9, 2011, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative

2

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

3

4.        Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.        Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Thomas Irons, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1974 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 0.00 | 1993 | $ 20,228.26 |
| 1975 | 0.00 | 1994 | 17,225.49 |
| 1976 | 0.00 | 1995 | 23,227.60 |
| 1977 | 150.00 | 1996 | 27,288.28 |
| 1978 | 0.00 | 1997 | 11,584.73 |
| 1979 | 1,006.30 | 1998 | 11,370.00 |
| 1980 | 1,699.25 | 1999 | 15,080.00 |
| 1981 | 1,826.60 | 2000 | 15,080.00 |
| 1982 | 3,916.23 | 2001 | 15,080.00 |
| 1983 | 6,734.43 | 2002 | 16,870.00 |
| 1984 | 10,190.48 | 2003 | 21,324.00 |
| 1985 | 6,112.45 | 2004 | 17,304.58 |
| 1986 | 11,073.76 | 2005 | 17,068.45 |

| 1987 | 12,413.75 | 2006 | 7,172.74 |
|------|-----------|------|----------|
| 1988 | 11,831.25 | 2007 | 0.00 |
| 1989 | 13,900.22 | 2008 | 0.00 |
| 1990 | 15,384.44 | 2009 | 0.00 |
| 1991 | 17,497.01 | 2010 | 0.00 |
| 1992 | 19,627.27 | 2011 | 0.00 |

(Tr. at 158).

## Function Report

In a Function Report completed on January 27, 2010, plaintiff reported that he has no difficulty with personal care, including caring for his hair; his ability to prepare meals has not changed due to his condition and he prepares his own meals daily; he cleans, does laundry, small and light repairs, mows on a riding mower, and does household chores which take about one hour every other day (Tr. at 174-181). He gets help from his son. He goes outside every day in the summer by walking, riding a bicycle, or riding in a car. He is able to go out alone. When asked to explain why he does not drive, plaintiff wrote, "Driving makes me extremely nervous and paranoid." (Tr. at 177). He does not shop at all. He is able to pay bills, count change, and handle bank accounts. His hobbies include watching television, reading, listening to the radio and old records, and playing a game of pool once in a while, although he reported that his legs give out when he plays pool. "I used to play pool for 8 hours in a day, but I can't now because of my legs & shoulder." (Tr. at 178). Plaintiff visits with a few friends two to three times a week when they come to his house (Tr. at 178). He wrote, "I haven't left my yard more than 10 times in 2 & 1/2 years." (Tr. at 178). He has to get a ride if it is very far. He does not get along with people he does not know very well. He can no longer go to movie theaters, restaurants, weddings, graduations, or recreation rooms (Tr. at 179).

Plaintiff's impairments affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, use his hands and get along with others. His

5

impairments do not affect his ability to remember, understand or follow directions. He explained that his concentration is impaired because of "tiredness & sleeplessness." He can pay attention for about an hour. He is good at following directions. He does not get along very well with authority figures, he does not handle stress or changes in routine very well.

**Disability Report - Appeal**

In a Disability Report - Appeal completed on April 11, 2010, plaintiff indicated that he had developed dizzy spells which he attributed to stress, and that these dizzy spells began on March 25, 2010[2] (Tr. at 189-196). The dizzy spells impair his ability to balance and walk.

**B.      SUMMARY OF TESTIMONY**

During the August 4, 2011, hearing, plaintiff testified; and Thomas Irons, a vocational expert, testified at the request of the ALJ.

**1.      Plaintiff's testimony.**

At the time of the hearing, plaintiff was 46 years of age (Tr. at 29). He is a high school graduate, is 6' 2" tall and weighs 213 pounds (Tr. at 29-30). His dominant hand is his right (Tr. at 30). He and his 23-year-old son live together (Tr. at 35). Plaintiff last worked in December 2006 hauling trash for Advantage Waste (Tr. at 30). Plaintiff worked for his brother (Jim Doty Services) as a trash man for several years (Tr. at 30-31). He would drive the truck, hop down and pick up the garbage, then hop back in the truck -- he ran it by himself (Tr. at 31). Plaintiff had worked for American Disposal in 1995 or 1996 and his brother was a supervisor there (Tr. at 31). His brother quit and started his own business and plaintiff started working for him (Tr. at 31). At some point, plaintiff's brother sold his business back to Advantage Waste, and that was the last time plaintiff worked (Tr. at 31). His brother has since

---

[2]Plaintiff's application for disability benefits had been denied a couple days earlier, on March 17, 2010.

started up another business called Doty Trash Services (Tr. at 31-32). Plaintiff has not gone back to work for his brother because he does not think he is able (Tr. at 32).

When plaintiff's job with his brother's company ended, it was getting harder for him to move and lift (Tr. at 32). At that time his knees, hips, shoulders and elbows hurt (Tr. at 36). Since he quit working, his hands are hurting too and now his hips feel like they are on fire (Tr. at 36-37).

Right after plaintiff quit working, he injured his right shoulder and now has trouble with lifting (Tr. at 37-38). He can now lift 15 to 20 pounds at the most and not for very long (Tr. at 38). He has trouble reaching over his shoulder with his right arm (Tr. at 38).

Just before he stopped working, his anxiety worsened so that he could not be out "in the mix of everything, everyday life, outside, around people." (Tr. at 32). He has not been able to go into a Price Cutters grocery store because of anxiety, but he can go into a convenience store if it is not very crowded (Tr. at 38). He has severe panic attacks (Tr. at 38). Plaintiff described his panic attack like constant butterflies in his stomach, similar to how he would feel in school before he participated in a sporting event (Tr. at 38-39). Plaintiff cries three or four times a week (Tr. at 39). Concentration has not been a problem for plaintiff (Tr. at 39). He can read books and remember what he has read (Tr. at 39).

Plaintiff was put on medicine for that (Effexor)[3] and it did not work (Tr. at 32). He felt like he was having a nervous breakdown all the time, his joints felt like they were on fire, and he decided that he would "take some time off" (Tr. at 32). "I had some savings built up at the time. I figured, well, I'll try to live on my savings and see if I can't get better. I thought I just needed some time off for real." (Tr. at 32). Instead of getting better, plaintiff's symptoms worsened (Tr. at 32). His medicine helps some (Tr. at 32). Plaintiff now has severe depression

---

[3]Treats major depressive disorder, anxiety, and panic disorder.

and "just really don't want to live, to be honest with you." (Tr. at 33). When plaintiff was asked about his mental health treatment, he testified as follows:

A.    Well, I seen that Eva Wilson. And she talked about me trying to get some help. And I told her, I can't do the group, the group therapy at all, because I just can't hardly be around people at all. And she said, well, maybe some one-on-one counseling, you know. I said, we could try that, but she never did really get into when or...

Q.    You've only seen her one time?

A.    Yeah, and that Medicaid sent me to her. My regular doctor has never sent me to a psychiatrist or nothing. . . . She . . . referred [me] to a Park Center in Monett. And I called them; they've got something like a two-month waiting list or something before I can even get in there.

Q.    She referred you to what type of a center?

A.    Place called the Park Center.

(Tr. at 33).

Plaintiff testified that he is "depressed just constantly, severely. Just severely." (Tr. at 34). Plaintiff is taking Tramadol[4] and Savella[5] for fibromyalgia, anxiety and depression (Tr. at 35-36). Dr. Wilson told plaintiff he needed to have his medication changed because the sun was affecting him -- he is "blood red in the face all the time and just burning up" because of the Savella (Tr. at 35). Plaintiff had no trouble with Savella until it got hot and he started spending a lot of time outdoors (Tr. at 35). This is the only mental health medication plaintiff takes (Tr. at 35).

Plaintiff has two DWI convictions and has not driven since he was 38 years old[6] (Tr. at 46). For the last two to three years of his career, he rode on the back of the trash truck and did

---

[4]Narcotic-like pain reliever.

[5]Medication which reduces pain perception in the brain.

[6]Plaintiff turned 38 years old in 2002 (Tr. at 129).

8

the labor because he lost his license and could not drive the trash truck (Tr. at 46). Although he is now eligible to get his license back, he does not think his anxiety would allow him to be an effective driver (Tr. at 46). When asked about his drinking now, plaintiff testified: "Very seldom do I drink anymore. I pretty much quit after the -- I went through my SATOP,[7] and paid all my fines, did community service. I just -- and if I do drink one, it'll be with my friends. I haven't really had any money in a long time. I never buy the stuff. My friends might bring me a beer or two over by once in a while. And I'll have a beer or two then. Usually never no hard alcohol." (Tr. at 46).

On a typical day, plaintiff gets up and tries to walk in his yard for about 20 to 30 minutes (Tr. at 37). Walking helps a little to loosen up his joints (Tr. at 34). But then he gets tired and has to sit down for 20 to 30 minutes (Tr. at 37). He alternates walking and sitting until he goes inside and takes a nap for a couple hours (Tr. at 37). He naps twice a day (Tr. at 37). He can no longer watch television because his electricity was shut off (Tr. at 34). Plaintiff can hardly go into a grocery store anymore; his son takes care of the shopping for him (Tr. at 34). He has trouble with his grip now that he is not working anymore (Tr. at 37).

2.    **Vocational expert testimony.**

Vocational expert Thomas Irons testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could occasionally climb, balance, stoop, kneel, crouch, and crawl; could do only negligible overhead reaching but could frequently reach in other directions; could frequently handle, finger, and feel. The person would be precluded from all but occasional exposure to cold, hot, wet, humid weather; vibration, moving mechanical parts, electric shock, hazardous exposed places, radiation, explosives, fumes, odors,

---

[7]Substance Abuse Traffic Offender Program.

dust, gases, or ventilation.[8]  The person could have only minimal contact with the public, co-workers and supervisors (Tr. at 41-42).  The vocational expert testified that such a person could not perform plaintiff's past relevant work but could be a cleaner/housekeeper which is light, unskilled, DOT 323.687-014, with 2,500 in the state and 123,600 in the country (Tr. at 42).  The person could be a marker, light unskilled, DOT 209.587-034, with 900 in Missouri and 42,600 in the country (Tr. at 42).  The person could work as a power screwdriver operator which is light unskilled, DOT 699.685-026, with 600 in the state and 20,000 in the country (Tr. at 42).

The second hypothetical involved a person who could do negligible ("a level of activity that closely approximates but [does] not quite reach the level of zero or none" or "less than one sixth of the day") climbing, balancing, stooping, kneeling, crouching and crawling (Tr. at 42-43).  The person could do negligible overhead reaching but could frequently reach in other directions, handle, finger and feel (Tr. at 43). The person would be precluded from all but negligible exposure to cold, hot, wet, or humid environments; vibration; moving mechanical parts; electric shock; hazardous exposed places; radiation; explosives; fumes; odors; dust; gases; and poor ventilation (Tr. at 43).  The person would be limited to minimal contact with the public, co-workers, and supervisors.  The person could only use foot controls negligibly (Tr. at 43).

The vocational expert testified that such a person could be an addresser, sedentary unskilled, DOT 209.587-010, with 700 in Missouri and 24,000 in the country (Tr. at 43). The person could also be a cutter and paster of press clippings, which is sedentary, unskilled, DOT 249.587-014, with 800 in Missouri and 32,400 in the country (Tr. at 43-44). The person

---

[8]I assume the ALJ meant "poor ventilation" rather than merely "ventilation."  In the second hypothetical he compared it to the first when he said "as before" and said "poor ventilation" (Tr. at 43).

10

could also work as a lens inserter, DOT 713.687-026, a final assembler, DOT 713.87-018, or a table worker, DOT 739.687-182 (Tr. at 44).

The third hypothetical involved a person with the same limitations as in the second hypothetical but with additional mental limitations (Tr. at 44). Due to the notations "inaudible" it is impossible to know what this hypothetical involved; however, that is irrelevant since the ALJ did not use this in his findings (Tr. at 44).

The vocational expert testified that a worker can miss about 1 1/2 days per month, or 18 days per year -- anything higher would preclude employment (Tr. at 45). Ten minutes or more of productive work missed per hour on a chronic basis would preclude employment; five minutes or less per hour (such as to stand up and stretch or use the restroom) would not preclude employment (Tr. at 45). Recumbent rest breaks over and above normal work breaks and lunch breaks would preclude work (Tr. at 45).

## C.    SUMMARY OF MEDICAL RECORDS

Either December 31, 2006, or May 14, 2007, is plaintiff's alleged onset date.

On February 11, 2010, Maria Carter, D.O., examined plaintiff in connection with his disability claim (Tr. at 242-246).

Identity was verified by drivers license. . . .

Patient complains of a completely torn muscle in the right arm and limited strength and movement in his shoulder. He stated he has a severe burning sensation in this shoulder that accompanies the pain. He complains of depression occurring most of the time, anxiety, agoraphobia, and paranoia. He reports he has not left his yard but 10 times in the last 3 years.

Patient states his pain began after falling off of a roof 3 years ago, landing on his right arm. He states he felt it break and had severe nerve damage for 6 months. He reports he did not receive medical treatment at that time. He was not working and did not have insurance, so patient does not know the extent of the damage caused by the accident. He believes his lower extremity problems are caused from hauling trash for 10 years prior to falling off the roof. Patient states depression and anxiety as minor when he worked at a factory. He reports agoraphobia began about 5 years ago, paranoia began while working in a factory from 1989-1995.

11

Patient states he is unable to do social things with his 21 year old son if he has to go out. He also states he cannot walk very far and is unable to carry things since his right shoulder is weak. He reports he is unable to lift his right arm over his head. All of these problems interfere with activities of daily living.

Patient states lifting and carrying things exacerbate his symptoms as well as walking or climbing. He reports going into public, too much stimulus, and peripheral movement exacerbate his mental status.

He reports [that] not using his right arm and shoulder relieve his symptoms of pain as well as staying off of his legs. He believes pain medications would help. Patient states Effexor helped with anxiety, but not with depression. He states he had an adverse reaction to the medication.

Patient states he is able to sit for 60 minutes, stand for 60 minutes, and walk 4 blocks. He reports being able to lift 15 lb with his right arm and 15-20 lb with his left arm, carrying it 15 feet. He states he is only able to handle objects 10-15 minutes due to decreased grip strength.

Patient denies problems speaking or following directions. He reports taking care of his own business and does not require outside help.

* * * * *

SOCIAL HISTORY:
Patient does not smoke but does occasional snuff, has occasional alcohol, and denies illegal drugs.

FAMILY HISTORY:
Patient's mother has mental issues and is on disability. . . .

CURRENT MEDICATIONS:
No medications.

* * * * *

OBJECTIVE EXAMINATION:
General: Patient is pleasant, well dressed, and is appropriate. He is concerned about his rapid physical decline.

12

Plaintiff's physical examination was normal, including his gait. Dr. Carter found the following range of motion values: Plaintiff's shoulder flexion[9] was normal on the left arm, but was 100/150 on the right. His shoulder abduction[10] and adduction were normal. Internal rotation[11] was normal, external rotation was essentially normal (80/90 on both arms). Elbow flexion and extension[12] were normal.



Elbow supination and pronation[13] were normal.   Dorsiflexion,[14] palmar flexion, radial deviation and ulnar deviation were normal on both wrists.  His hands could be fully extended, he could make a fist, and his fingers could be opposed.  Grip strength was 4/5 on the left, 3/5 on the right.  Upper extremity strength was

---

13



FOREARM

Supination     Pronation

14



**The Wrist**

Fig. 24
Neutral position

Fig. 25
Dorsi-flexion and palmar
flexion (extension and
flexion)

Fig. 26
A. Radial flexion
(abduction)
B. Ulnar flexion
(adduction)

Fig. 27
Dorsi-flexion

Fig. 28
Palmar flexion

Case 3:12-cv-05003-REL   Document 17   Filed 04/16/13   Page 14 of 44

5/5 on both arms with good effort. Knee flexion/extension[15] was 80/150 on both legs. Hip

forward flexion[16] was 70/100 on the right and 80/100 on the left. Hip backward extension

---

[15]



[16]



was normal, abduction was 30/40 on both legs, adduction was normal. Lateral flexion[17] of the

neck was essentially normal (40/45 on the right, normal on the left), flexion and extension

17



16

were normal, and rotation was 70/80 on the right and left. Lumbar spine flexion-extension[18] was 80/90; lateral flexion was 20/25 on the right and left. Straight leg raising[19] was positive on the right and left at 45°. Lower extremity muscle strength was normal in both legs with good effort.

> SUMMARY: Pleasant man with physical pain in his lower extremities and right shoulder and arm that have not been adequately treated. His anxiety and depression are progressive and under treated. He does not appear to be anti social but agoraphobic. This is also under treated. His behavior is functional and appropriate but could improve with medications and counseling.
>
> Diagnoses after evaluation are right arm and shoulder pain, lower extremity myalgia [muscle pain] and arthralgia [joint pain], anxiety, depression, mild paranoia, and agoraphobia.

---

[18]



**The Spine**

Fig. 5
Forward bending
(flection)

Fig. 6
Backward Bending
(extension)

Fig. 7
Lateral bending
right and left

Fig. 8
Rotation,
right and left

[19]In most cases the patient will lie down on a table (sitting is a less common variation), and the doctor will lift the patient's straightened leg into the air. If the patient feels pain that travels down his leg when it is lifted to the 30° to 70° range, then the straight leg raise test is considered positive. That pain should replicate what the patient would describe as his typical leg pain. The radiating leg pain is called sciatica, among the most common and painful symptoms of a lumbar herniated disc. A straight leg raise test is used to help diagnose a lumbar herniated disc because the simple act of raising the leg stretches the spinal nerve root; doctors call this stretching excursion of the nerve. If the patient has a lumbar herniated disc, it should press on the stretched nerve root as the leg is raised above 30°.



17

On March 8, 2010, Kenneth Burstin, Ph.D., completed a Mental Residual Functional Capacity Assessment in which he found that plaintiff was not significantly limited in any of the standard 20 mental categories except four (Tr. at 247-249). In the following three categories, he found that plaintiff suffers a moderate limitation: the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. He found a marked limitation in plaintiff's ability to interact appropriately with the general public. He noted that plaintiff retains the capacity to acquire and retain complex instructions and to sustain concentration and persistence with complex tasks. He can adapt to changes in settings which do not require frequent public contact or very close interaction with others in the workplace.

The next day, Dr. Burstin completed a Psychiatric Review Technique (Tr. at 250-260). He found that plaintiff suffers from depression not otherwise specified[20] and anxiety as evidenced by a persistent irrational fear of an activity. He found that plaintiff has moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Burstin wrote:

> This 45-year old claimant alleges disability due to anxiety, depression, paranoia and antisocial behavior. The claimant states he has not been out of his yard over 10 times in the last 2.5 yrs. However, in addressing his hobbies and interests, he states that he does play a game of pool once in a while. He states that he does not drive due to anxiety and paranoia, but does retain a driver's license. He alleges difficulty in getting along with others.

---

[20]This designation abbreviated NOS can be used when the mental disorder appears to fall within the larger category but does not meet the criteria of any specific disorder within that category.

18

The claimant had no medical treatment to disclose so a CE was order[ed] from Maria Carter, D.O. She diagnosed anxiety, depression, mild paranoia, and agoraphobia. In her summary, she states that his behavior was functional and appropriate, but could improve with medications and counseling.

There is no evidence that claimant is completely unable to function outside of the confines of home, leaving aside issues of duration and lack of treatment; and the recent medical CE [consultative examiner] saw him as functional. Clearly, however, public-contact work would be precluded.

On March 17, 2010, plaintiff's application for disability benefits was denied by SSA.

On May 18, 2010, plaintiff saw David Van Pelt, Psy.D., "to assist in his pursuit of qualifying for Medical Assistance" (Tr. at 268-271). Plaintiff told Dr. Van Pelt that he tore some muscles and his rotator cuff in his right shoulder when he fell three years earlier. He reported constantly-burning joints in his knees and hips. He said his legs tire out quickly and get numb. He reported pain around his tail bone and loss of grip in his hands. He said he had not sought medical treatment due to a lack of insurance or money. He had been diagnosed as having high anxiety four or five years ago and took Effexor for three months but "stopped because it put blood clots and bruises all over my harms. Also I lost my job and I couldn't afford it." Plaintiff said his anxiety was due to stress.

When asked about specific symptoms he said, "I've got a ... well; I haven't left my yard in 2 years. I haven't left 15 times in the last two years. The doctor in Springfield called it agoraphobia. I can't be out in public. The severe part of it began going on about 3 years ago, but I've had it for longer. I haven't eaten in a restaurant in 10 years. I kinda get paranoid and I think they're talking about me. I don't like people glaring and snickering at me. Then they start talking about me. That's why I can't work.' He was unable to identify a specific situation which changed 3 years ago but said, "I've always been a hard worker and I worked up until then. I get nervous; it's not shaking, it's just nervous in my stomach. I get nervous; real bad nervous. I get burning in my arms and get tense. I also get to breathing hard." Mr. Doty described having a discreet period of intense fear or discomfort in which the following symptoms develop abruptly and reach a peak within 10 minutes. He experiences palpitations and an accelerated heart rate; sweating; trembling and shaking; shortness of breath and sensations of smothering; nausea and abdominal distress; dizziness and lightheadedness; derealization, and paresthesias (tingling sensations). Mr. Doty has recurrent, unexpected panic attacks, has a persistent concern about having an additional attack, is worried about the implications of the attack and its consequences and had had a significant change in his behavior as a result to [sic] the attacks.

19

Mr. Doty is a 45-year-old, single, never married Caucasian male. His appearance would best be described as clean and casual. Throughout the interview, he exhibited a calm and stable mood and had a pleasant affect.

Plaintiff described a normal childhood. He got along well with his parents and siblings. He was in a five-year relationship in the past and considers the two daughters of his former girl friend to be "stepchildren." He continues to have a positive relationship with one of them who was 27 years old. He had not been in a relationship with a woman for the past two years. Plaintiff did well in school, got along with everyone, had a positive relationship with authority figures.

Mr. Doty is currently unemployed. His last job was in 2007 when he worked from Advantage Waste. He noted this trash hauling company was previously owned by his family before they sold to Advantage Waste. He has been in the trash hauling business for 12 years. While working he had a positive relationship with his coworkers, but had a mixed relationship with his employers. Prior to hauling trash, he did factory work for 7 years at EFCO. This job ended because "it got to be too much to be around the people and the management was out of this world. I started getting my dizzy spells over there. I liked the job but the management just worked you to death." He has been steadily employed as an adult until 2007. When asked about his current limitations to employment, he said, "It's the way I feel. I don't think so. I get tired. Mentally I think I would have a nervous breakdown."

\* \* \* \* \*

Mr. Doty denied being hospitalized for psychiatric reasons. He was involved in counseling while in school and said, "For just being kind of stressed." He denied any counseling as an adult. He denied homicidal ideation but said, "I've been so mad that I could kill somebody. I've been close to that point." He also reported a history of suicidal ideation but denied suicide attempt. He reported becoming depressed quite a bit and said, "Sometimes are more severe. It lasts for a couple weeks at a time and there's a history of that in my family." He becomes depressed when reflecting on the past and how pleasant it was. He said, "I guess you'd say I don't like the way the world has become." He denied problems with his appetite or concentration. He has restless sleep due to worry. He denied problems with feeling guilty or worthless. He experiences suicidal ideation once a week and rated the thoughts as severe. He said, "If I had a gun, I would probably blow my head off. I sit around thinking about how I don't like how the world is. I love this country but I feel like it's going downhill."

Mr. Doty reported a family history of alcoholism and said, "It runs through my family." He denied smoking cigarettes but using 1/3 of a can of smokeless tobacco a day. He began using this at the age of 12. . . . His alcohol use is "socially, usually, two to three times a week I'll have a six-pack. I like to drink beer. I don't drink to get drunk. I

20

drink to get relaxed. I've never been on medication." When drinking his heaviest he was consuming a 12-pack 3 or 4 times a week and did this for 2 to 3 years. He reported incurring a DWI in 2004 in which he had 0.217 blood alcohol content. He denied current marijuana use and said, "I tried it when I was a kid." He denied any illicit substance abuse. . . .

Mr. Doty does not possess a valid driver's license, and has been arrested 3 times over the course of his life. Two of the arrests were for DWI, both of which occurred within 14 days of each other, and an assault in 2007, which happened at a bar. . . .

. . . When asked about his strengths he said, "I was a good trash hauler and a very good window builder when I was doing it. I'm also good at playing pool."

MENTAL STATUS EXAM:
. . . He [was] clean and casual and was dressed in jeans, a tee-shirt, and tennis shoes. His hygiene appeared normal and routine. There were no unusual mannerisms noted in his psychomotor activity. His attention and concentration appeared to be adequately functioning. He was alert and his orientation was grossly intact. There seemed to be no impairment in his recall and memory abilities. His eye contact was appropriate and his facial expressions were within the normal limits. His attitude was cooperative, pleasant and forthcoming during the evaluation. Mr. Doty described his mood today as "between a 1 and a 10, I'd say a 5. I was all nervous and wound up this morning but I'm feeling better now." He said his mood most days is "If I stay at home probably a 3 or 4, that's a poor mood. There are no days that I feel like a champion, but some days are better. I just don't feel good. I used to be healthy as a horse." His affect was initially anxious, but relaxed as the interview progressed. His speech was normal in rhythm, rate, and tone and was easily understood. His thought content was appropriate to the mood and circumstances, and there was no evidence of delusions or hallucinations. His intellectual ability is considered average. His judgment is adequate and his insight is impaired. He reported significant suicidal ideation but denied plan, intent, or means to act. He denied homicidal ideation currently. His overall impulse control is considered good to fair.

DIAGNOSTIC IMPRESSION:
| | |
|---|---|
| Axis I: | Panic Disorder with Agoraphobia |
| | Depressive Disorder Not Otherwise Specified (NOS) |
| | Alcohol Dependence in Partial Remission (per patient report) |
| Axis II: | No Diagnosis on Axis II |
| Axis III: | Pain in shoulder and upper arm, pain in legs, and poor circulation (per patient report) |
| Axis IV: | Estrangement from siblings; Inadequate health insurance; Unemployment; and Inadequate finances |
| Axis V: | GAF 60[21] (current) |

---

[21]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

SUMMARY AND RECOMMENDATIONS:
. . . Based upon the opinion of this examiner and clinical findings, Mr. Tomie Doty is considered psychologically eligible for Medical Assistance. It does appear Mr. Doty's perceived emotional disturbance is of the severity and/or magnitude sufficient enough to preclude him from performing an occupation. In my opinion, Mr. Doty has a mental/emotional condition which prevents him from engaging in employment or gainful activity for which his age, training, experience, and/or education will fit him. In my opinion, the expected duration of disability and incapacity will be approximately twelve months, but should remit substantially with appropriate intervention.

Mr. Doty is strongly encouraged to seek medical treatment as well as psychotherapeutic intervention. Individual psychotherapy could greatly assist him in dealing with the current stressors he is experiencing, strengthen his coping resources, and likely return him to a higher state of functioning.

(Tr. at 268-271).

On July 15, 2010, plaintiff saw Samuel Watts, M.D., to re-establish care (Tr. at 284-289). "Haven't seen > 3-4 years. Pt last worked for brother (waste disposal) 2007. That year, pt fell off roof. No insurance, no care sought. Reports 'tore up my right shoulder.' Weak since. Also complains [of] generalized fatigue, joint aches knees, hips. Exertional fatigue. Prior use of effexor 'made me bruise.' Obtained my last office note of 06-02-05 noting then chemical dependency to alcohol, effexor prescribed then." Plaintiff reported using a container of smokeless tobacco every three days and consuming beer two to three times a week with an occasional six-pack on Saturday. When asked about his psychological symptoms, plaintiff reported "long hx [history] of mood disorder. Mother was strange too." Plaintiff was observed to be pleasant and soft-spoken. He had tobacco debris in his mouth with gum disease present. Plaintiff had full range of motion in his shoulders with "slight hesitation" in his right. Dr. Watts assessed chronic mood disorder and generalized myalgias. "No active synovitis [inflammation] today in IPs, MCPs [fingers], wrists, elbows, shoulders, knees, ankles." Dr. Watts ordered lab work and gave plaintiff samples of Savella. His liver enzymes were high: AST was 54 (normal is 12-43) and his ALT was 81 (normal is 4-51).

22

On July 30, 2010, plaintiff saw Dr. Watts for a follow up (Tr. at 277-278, 281, 290). Plaintiff continued to use 1/3 container of smokeless tobacco every day, and he was drinking beer two to three times a week with an occasional six-pack on Saturdays. He noted he was allergic to Effexor as it gives him a rash. "On second day of savella 50 mg BID [twice a day] - noticed heart pounding. Backed down to 25 mg BID and tolerated. Recent pulling on starter for riding lawnmower - right arm and shoulder ache considerably afterwards. No swelling." Plaintiff's recent lab tests showed mild elevation of liver function tests "in patient with known (nearly) daily beer intake. Admits heavier in past. 'When my friends come over I'll drink a few with them.' Plus admits to a six pack on a weekend." Plaintiff said his knees were better after two weeks on Savella. He requested medication for his right arm and shoulder "as needed" but said he did not want anything addicting. Dr. Watts assessed "right shoulder pain - primary" and "dysthymia". He prescribed Ultracet[22] and scheduled an MRI of the right shoulder.

On August 27, 2010, plaintiff saw Dr. Watts (Tr. at 278-279). Plaintiff said that Savella at 25 mg twice a day was helping his anxiety/depression slightly but he was having "quite a bit" of aches in his knee and hips. His right shoulder was still an issue but "using Ultracet (2) daily - w/good effect." Plaintiff was observed to be pleasant, no smell of alcohol, no tremor, well groomed. He was 30 minutes late for his appointment. His MRI was rescheduled and he was told to continue Savella at 25 mg three times a day. "Medicaid approved."

---

[22]Acetaminophen (Tylenol) and Tramadol, treats moderate to severe pain.

23

On September 13, 2010, plaintiff had an MRI of his right shoulder (Tr. at 294). Jeffrey Shore, M.D., assessed "no sign of rotator cuff tear" but "suspect chronic labral tear[23] and derangement of the anterior labral cartilage" due to a deficient thinned appearance of the central labral cartilage.

Despite having been approved for Medicaid, plaintiff saw no medical provider during the next six months.

On March 14, 2011, plaintiff saw Samuel Watts, M.D., complaining of a round black spot on his right wrist after having been bitten by a bug a week earlier (Tr. at 273, 280). Plaintiff reported that he has two friends who recently had staph infections. "Pt is a beer drinker." Dr. Watts took a culture of the sore and diagnosed probable staph infection, culture pending. "Otherwise - Maintaining fairly well w/chronic shoulder pain and tramadol/savella." He prescribed an antibiotic. Two days later, he called plaintiff's residence and got plaintiff's voicemail. He left a message that the culture came back negative.

On May 10, 2011, Dr. Van Pelt completed a Medical Source Statement - Mental (Tr. at 291-292). Dr. Van Pelt had examined plaintiff a year earlier in connection with plaintiff's application for Medicaid and had predicted that plaintiff's condition would last 12 months. Dr. Van Pelt found that plaintiff is not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

---

23



- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found plaintiff moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

He found plaintiff markedly limited in the following:

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

On July 20, 2011, plaintiff saw Eva Wilson, Psy.D. for a psychological evaluation (Tr. at 296-298). Her records were not presented to the ALJ but were presented to the Appeals Council.

IDENTIFYING INFORMATION AND REFERRAL SOURCE: Mr. Doty identified himself with the use of a non-driver's license. He arrived on time for his appointment and bicycled to the appointment from across town. . . . Mr. Doty is attempting to qualify for medical assistance.

* * * * *

PRESENTING PROBLEM: Mr. Doty said that he has been suffering from severe anxiety and depression as well as fibromyalgia, which causes burning in his joints. It takes him a great deal of time to do anything. . . . He believes that he had a nervous breakdown some time in the past but was not hospitalized for this. He was under a great deal of stress after he lost his girlfriend, the mother of his son, and he was forced to raise his son alone. He worked full time at Efco and had a very difficult time with this. He does not like to leave his house and said that he had only left it perhaps 30 times in the past five or six years. He is attempting to qualify for Social Security Disability and has a hearing on August 4th with the help of the attorney, Dan Parmele. He consults with Dr. Watts for his medication, however, I believe that he should be seeing a psychiatrist. He claims that he is in severe anxiety all of the time and feels as though he is shaking. He has not had any recent psychotherapy, although he did as a youth.

PRESENT MENTAL ILLNESS: Mr. Doty describes severe anxiety as well as depression with suicidal ideation. He has never tried suicide nor been hospitalized for suicidal ideation, however, he does fantasize about taking his own life. He denies an active plan for suicide. I suggest psychotherapy and referred him to the Clark Center.

PAST HISTORY OF MENTAL ILLNESS AND SUBSTANCE ABUSE: Mr. Doty denies a history of substance abuse. He has felt this anxiety for most of his life. He was in counseling as a child with his family because his mother had suffered from suicidal ideation and four people in his family did commit suicide including four uncles and one cousin.

FAMILY CIRCUMSTANCES: . . . [He] began his own trash business with his brother, Jim Doty, after he worked for American Disposal in 1995. . . . At this time, Mr. Doty lives with his grown son. He has friends that help him out. He has lost his father but his mother is still alive. He was on unemployment benefits from 1996 to 1997 but then he had to sell his vehicles and he has no savings left. He lost his driver's license because of using alcohol but claims that he no longer uses alcohol. He enjoys watching television, animal movies, and reading.

GENERAL APPEARANCE: . . . His hygiene was adequate.

26

MOOD:  Mr. Doty's mood appeared to be in a pleasant mood, but he did appear to be in pain.

BEHAVIOR:  Mr. Doty was pleasant and cooperative and exhibited no unusual mannerisms.

Plaintiff's affect was consistent with his mood; his speech, thought content, and perception were within normal limits.  He scored in the above-average range of intellectual functioning and memory.

MINNESOTA MULTIPHASIC PERSONALITY INVENTORY - 2 RESULTS:  Mr. Doty produced a valid profile.  Of clinical significance is the presence of severe anxiety concerning his physical symptoms, and a lack of insight into the emotional exacerbation of these symptoms.  He is also suffering from severe depression, anxiety and social introversion.  He suffers from some strange and unusual thoughts.

PROGNOSIS AND RATIONALE:  This appears to be an intelligent gentleman who is in need of medical attention.  I do not see him as being on the correct medications, although I do not prescribe medications.  He says that his anxiety and depression, as he describes them, are not relieved by the medicine that he is on now.  I suggest that he see a psychiatrist.

CAPABILITY TO MANAGE OWN FUNDS:  Mr. Doty could manage his own funds as he is not cognitively impaired.

DIAGNOSTIC IMPRESSIONS:
Axis I:        Mood Disorder, due to chronic pain w/depressive and anxious features, severe
               Generalized Anxiety Disorder
               Major Depression, severe
Axis II:       No diagnosis
Axis III:      Fibromyalgia
Axis IV:       Problems w/Access to Health Care Services: inadequate health care services
               Employment Problems:  unemployment
Axis V:        Current GAF (Psych) 50, serious
               Past Year, 50 to 60, serious to moderate

On September 27, 2011, Dr. Wilson completed a Medical Source Statement - Mental based on her one-time visit with plaintiff two months earlier in connection with his application for medical assistance (Tr. at 301-302).  She found that plaintiff was not significantly limited in the following:

27

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

She found that plaintiff is moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to set realistic goals or make plans independently of others

She found that plaintiff is markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge James Lessis entered his opinion on September 23, 2011 (Tr. at 13-21).   Plaintiff's last insured date was December 31, 2011 (Tr. at 13, 15).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date, December 31, 2006 (Tr. at 15).

Step two.  Plaintiff's severe impairments consist of generalized myalgias, panic disorder with agoraphobia, and depressive disorder (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff retains the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; stand and walk for six hours per day; sit for six hours per day; occasionally climb, balance, stoop, kneel, crouch, and crawl; only negligible overhead reaching; frequently reach other than over head, handle, finger, and feel; may have occasional exposure to extreme temperatures, vibrations, moving mechanical parts, electrical shock, hazardous exposed places, radiation, explosives, fumes, odors, dust, gases, and poor ventilation; and he is limited to minimal contact with the public, co-workers, and supervisors (Tr. at 16).  With this residual functional capacity, plaintiff cannot perform his past relevant work (Tr. at 19).

Step five.  Plaintiff can adjust to other work in significant numbers, such as a cleaner/housekeeper, with 2,500 jobs in Missouri and 123,600 in the country; a marker, with 900 jobs in Missouri and 42,600 in the country; or a power screwdriver operator, with 600 jobs in Missouri and 20,300 in the country (Tr. at 20).  Therefore, plaintiff was found not disabled (Tr. at 20-21).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to

30

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> In regards to activities of daily living, the claimant testified that he gets up and tries to walk in the yard. [It] is hard for him to leave his yard due to agoraphobia. He stated that he lives with his son and [his son] takes care of the shopping. The claimant testified to being able to walk for about 20 to 30 minutes before having to sit down. He can lift 15 to 20 pounds but has problems reaching over the right shoulder.

> In this case, the medical evidence reflects that the claimant presented to Maria Ca[r]ter, D.O., on February 11, 2010 for a Social Security Disability examination. During the examination, the claimant complained of a completely torn muscle in the right arm and limited strength and movement in his shoulder. He stated that he had a severe burning sensation in his right shoulder accompanied by pain. The claimant also complained of depression associated with symptoms including anxiety, agoraphobia, and paranoia. Upon examination, the following was noted:

> Shoulder:
> | | |
> |---|---|
> | Flexion: | Right 100 degree, left 150 degree |
> | Abduction: | Right 90 degree, left 90 degree |
> | Adduction: | Right 30 degree, left 30 degree |
> | Internal rotation: | Right 80 degree, left 80 degree |
> | External rotation: | Right 80 degree, left 80 degree |

> In summary, Dr. Carter noted the claimant was a pleasant man with physical pain [in] his lower extremities and right shoulder and arm that had not been adequately treated. His anxiety and depression were progressive and under treated. He did not appear to be antisocial but agoraphobic, which was also under treated. However, Dr. Carter further noted the claimant's behavior was functional and appropriate, but could improve with medications and counseling. Dr. Carter's diagnoses were right arm and shoulder pain, lower extremity myalgia and arthralgia, anxiety, depression, mild paranoia, and agoraphobia.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. The finding of diminished credibility is supported by inconsistencies between the claimant's allegations and the paucity of objective medical evidence. Specifically, the claimant complains of right shoulder pain. However, the medical evidence including Dr. Carter's physical examination fails to show that the claimant is unable to use his right

31

shoulder. In fact, a[n] MRI of the right shoulder performed on September 13, 2010, showed no sign of rotator cuff tear detected in the right shoulder.

The claimant also complains of pain in his knees, hips, and joints. However, the medical evidence fails to contain the clinical findings demonstrating disabling knee, hip, and joint pain. Specifically, the medical file shows that the claimant's knees were better after just two weeks of Savella. The undersigned accepts the claimant's allegations of knee, hip and shoulder pain. However, there is nothing in the medical file suggesting that he is unable to ambulate or use his upper extremities effectively. The claimant is capable of performing at least a range of light work with the restrictions provided above.

The undersigned notes that the claimant also alleges disability due to panic attacks. On May 8, 2010, he was referred to David Van Pelt, Psy.D., for a psychological evaluation. The purpose of the evaluation was to determine [whether] he was suffering from a mental/emotional illness, which might prevent him from performing an occupation for which he is qualified. Upon mental status examination, it was noted that the claimant's hygiene appeared normal and routine. There were no unusual mannerisms noted in his psychomotor activity. His attention and concentration appeared to be adequately functioning. He was alert and his orientation was grossly intact. There seemed to be no impairment in his recall and memory abilities. His eye contact was appropriate and his facial expressions were within the normal limits. His attitude was cooperative, pleasant, and forthcoming during the evaluation. His speech was normal in rhythm, rate, and tone and was easily understood. His thought content was appropriate to the mood and circumstances, and there was no evidence of delusions or hallucinations. Dr. [Van] Pelt's diagnostic impression was panic disorder with agoraphobia, depressive disorder, and alcohol dependence in partial remission. Dr. [Van] Pelt assigned the claimant a Global Assessment of Functioning (GAF) score of 60.

The undersigned concludes that the medical evidence especially the report of Dr. [Van] Pelt clearly shows that the claimant does not have [a] mental impairment, which prevents him from being able to perform work-related activities. Although [he] reports symptoms of panic disorder, the medical evidence fails to show ongoing treatment for a mental disorder nor is there any evidence of psychiatric admissions.

When evaluating the claimant's credibility, the undersigned notes that he testified that he takes no medication for his mental health issues. His refusal to seek medication for his mental symptoms, certainly suggest that his symptoms might not have been as bothersome as alleged. Moreover, it was Dr. Carter's opinion that the claimant's behavior was functional and appropriate, but could improve with medications and counseling, which he has not pursued.

(Tr. at 17-19).

Plaintiff argues that the ALJ gave little weight to plaintiff's subjective reports because they were not supported by medical evidence. The substantial evidence in the record supports

the ALJ's finding.

Although plaintiff has fairly consistent earnings, his income dropped substantially in 2006 to less than half the amount he earned the year before and a third of what he had earned three years earlier. Plaintiff stated that he worked until December 31, 2006 (or the entire calendar year) and he testified that he stopped working when his brother sold the business. His earnings record shows that he earned $3,373.14 working for his brother's trash company in 2006; he earned $1,160.60 at AW Services after his brother sold the company to Advantage Waste, and then he earned $2,639.74 that year in self employment (Tr. at 143). His earnings record suggests that plaintiff stopped working for some reason other than his impairments, especially considering that he alleged elsewhere in the record that his disability began in May 2007 when he fell off a house five months after he had stopped working.

Plaintiff's daily activities include preparing his own meals, cleaning, doing laundry, performing small and light repairs, mowing the lawn on a riding mower, and doing household chores. Although plaintiff stated in his Function Report that driving makes him "extremely nervous and paranoid," the evidence establishes that he lost his license due to a DWI conviction. There is no explanation as to why plaintiff now believes he is too nervous and paranoid to drive when he drove a large trash truck for a living prior to losing his license for a criminal conviction. He testified that he had not driven since he was 38 years old, but he turned 38 in 2002 and worked into 2006 which shows that he exaggerated when he testified (after that discrepancy was mentioned) that for the last "2 to 3 years" of his career he rode on the back of the trash truck and did not drive. In July 2011 -- almost five years after plaintiff's alleged onset date -- he was able to bicycle "from across town" to see Dr. Wilson in connection with an application for government benefits. This is wholly inconsistent with complete disability.

Plaintiff's developing dizziness as soon as he learned that his disability application was initially denied does not support his credibility. He testified that he has trouble with his grip now that he is not working anymore, which is inconsistent with a finding that work would aggravate any gripping difficulty.

Plaintiff testified that "medicine helps some" but the record shows that plaintiff rarely took any medication. He reported that his knees were better two weeks after starting Savella and that he was getting "good effect" with Ultracet less than a month after he started taking it, suggesting that medication can control his symptoms. He told Dr. Van Pelt (in connection with his application for government benefits) that Effexor caused blood clots and bruises; however, he told Dr. Watts (in connection with treatment) that it gave him a rash. He testified that he was taking medication for fibromyalgia; however, no doctor ever diagnosed fibromyalgia. Plaintiff's alleged onset date is December 31, 2006, but the first medical record in the file is dated February 11, 2010 -- more than three years later -- and that was a consultative exam in connection with his application for disability benefits. There is no evidence that plaintiff ever sought medical care and was denied, or that he explored any type of free health care during those years or at any subsequent time.

Plaintiff greatly exaggerates his symptoms. He testified that he has "severe panic attacks" but then described the severe panic attack as butterflies in his stomach like he used to have before he participated in a sporting event in school (and he reported he performed multiple sports for many years). "Butterflies" hardly describes a "severe panic attack." He testified at his hearing that he did not want to live, and he told Dr. Van Pelt that if he had a gun he would blow his head off. However, he was approved for Medicaid and never sought any help with these very severe symptoms of suicidal ideology, suggesting that those symptoms were exaggerated. Furthermore, plaintiff never took any medication for mental symptoms

after his alleged onset date. Plaintiff told Dr. Carter that he felt his arm break in 2007 when he fell off the roof and also had severe nerve damage. He told Dr. Van Pelt he tore his rotator cuff and some other muscles during that fall. However, he never sought any medical care for the severe injuries he believed he suffered, suggesting his condition post-fall was not as bad as he is now alleging.

Plaintiff told Dr. Carter that his paranoia began in approximately 1989, yet he was able to work full time for many years after that and in fact earned significantly more in the years since he allegedly began suffering from paranoia than he did before. He told Dr. Wilson that he suffered a nervous breakdown when he lost his son's mother and was forced to raise his son alone; however, his son was approximately 23 years of age at the time indicating that plaintiff was able to work after that event for several decades. He told Dr. Wilson that he had a "very difficult time" working full time at EFCO, but according to his earnings records he last worked at EFCO in 1995 -- more than a decade before his alleged onset date.

Plaintiff's first physical exam was with Dr. Carter in connection with an application for government benefits; his physical exam was normal. The only abnormality in his range of motion was with his ability to reach overhead with his right arm -- a condition which the ALJ considered when he found that plaintiff can perform only "negligible" overhead reaching. Despite plaintiff's being on no medication and receiving no treatment for any impairment, Dr. Carter found that plaintiff was functioning appropriately but could benefit from medical treatment. Her only physical diagnosis was pain -- right arm and shoulder pain, lower extremity pain, and joint pain, all of which are subjective.

In late August 2010, Dr. Watts's medical record confirms that plaintiff had Medicaid coverage, yet in the next nine months plaintiff never went to any doctor for any reason, except the MRI Dr. Watts had to reschedule after plaintiff was late for that August 2010 appointment.

After going nine months without medical care, the impairment that finally sent plaintiff back to the doctor for treatment was a bug bite -- not severe depression, not agoraphobia, not anxiety, not shoulder pain, not joint pain or burning.

Plaintiff saw a treating doctor only five times during all the years covered in this record, four of which occurred during a three-month period.

Plaintiff testified that he worked for his brother who owned a trash service; however, he told Dr. Wilson that he "began his own trash business with his brother." Plaintiff told Dr. Van Pelt he had a normal childhood; however, he told Dr. Wilson that he was in counseling as a child with his family because of many family suicides and his own mother's suicidal ideation.

When asked about his drinking, plaintiff testified that he really hasn't had any money in a long time and never buys alcohol so his friends bring him "a beer or two . . . once in a while." This is inconsistent with his reports in medical records that he drinks beer multiple times a week including a six-pack on Saturdays. Additionally, his liver enzymes were high in 2010 suggesting that he continued to drink on a regular basis. Dr. Watts noted that he had diagnosed plaintiff with alcohol dependency in 2005; however, plaintiff denied a "history of substance abuse" to Dr. Wilson and told her that he does not use alcohol, despite having told every other doctor (and the ALJ) that he continues to drink beer multiple times a week.

Based on the substantial evidence in the record as a whole, I find that the ALJ's decision to discredit plaintiff's subjective complaints of disabling symptoms is supported by the record.

## VII. CHRONIC LABRAL TEAR

Plaintiff argues that the ALJ erred in finding that plaintiff's chronic labral tear was a non-severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities

36

without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)     Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b)  Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--
>
> > (1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . .

20 C.F.R. § 404.1512(f) states, "If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."  The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.  Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994).

In a Function Report dated January 27, 2010, plaintiff reported having no difficulty caring for his hair, which requires reaching above shoulder level.  The following month, he was examined by Dr. Carter who noted that plaintiff's range of motion was essentially normal everywhere except he had a limited range of motion in his right shoulder -- his right shoulder flexion (lifting the straightened arm up over the head in front of the body) was 100° whereas normal is 150°.  Despite that limitation, she found that plaintiff suffered from nothing more serious than "right arm and shoulder pain."  I note here that the limitation in shoulder flexion was during an examination that was in connection with plaintiff's application for government benefits.  In July 2010 when plaintiff saw Dr. Watts for medical care, he had full range of motion in his shoulders with "slight hesitation" in his right.  Because range of motion findings

37

are based on a claimant's subjective complaint of pain upon certain movements, and because plaintiff's range of motion was significantly worse during an exam for government benefits than it was during a subsequent exam for medical care, the ALJ would have been justified in giving more weight to the range-of-motion findings of plaintiff's treating doctor, Dr. Watts, who found normal range of motion in both shoulders.

In September 2010 plaintiff was covered by Medicaid and he had an MRI which showed the "chronic labral tear" that plaintiff argues is a severe impairment. Despite having medical coverage and learning of this condition, plaintiff sought no medical treatment for it at all, not then, not ever. In fact, six months later when he went to the doctor for a bug bite, he noted that he was maintaining fairly well with his chronic shoulder pain.

The record shows that plaintiff complained of severe, disabling shoulder pain when he was seeing a doctor for government benefits; but when he saw his treating doctor, it was for conditions other than his shoulder and he reported that his shoulder was doing OK. The ALJ was not required to obtain any further medical evidence of plaintiff's shoulder impairment because the information needed by the ALJ was "readily available from the records of [plaintiff's] medical treatment source."

The substantial evidence in the record supports the ALJ's finding that plaintiff's shoulder impairment was not severe.

## VIII.   RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity because it was not based on any medical evidence. Specifically, plaintiff alleges that there is "no medical evidence addressing Doty's physical RFC" and he challenges the ALJ's decision to give more weight to the opinion of Dr. Burstin rather than accepting the limitations described

Case 3:12-cv-05003-REL   Document 17   Filed 04/16/13   Page 38 of 44

by Dr. Van Pelt whose "assessment was later corroborated by Dr. Wilson's assessment of Doty's mental limitations."

Physical limitations.

An ALJ must formulate a claimant's residual functional capacity based on all the relevant, credible evidence of record. Cox v. Astrue, 495 F.3d 614 619 (8th Cir. 2007). When a "crucial issue is undeveloped" and the evidence is not sufficient to allow the ALJ to form an opinion, the ALJ has a duty to develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Here I find that the substantial evidence in the record provides sufficient information to allow the ALJ to decide plaintiff's physical limitations.

With respect to plaintiff's physical limitations, the record (discussed at length above) establishes that plaintiff had some pain when raising his right arm above his head. Despite having records of a treating physician finding that plaintiff's range of motion was normal, and records of a consulting physician finding that plaintiff had only some limitation in his range of motion, the ALJ limited plaintiff to "negligible" overhead reaching. The evidence of plaintiff's physical limitations is discussed at length above and will not be repeated here. I find that based on the substantial evidence in the record, the ALJ's residual functional capacity assessment with respect to plaintiff's physical abilities is proper.

Mental limitations.

Plaintiff argues that Dr. Van Pelt's opinion in the Medical Source Statement completed on May 10, 2011, should have been given controlling weight. Plaintiff saw Dr. Van Pelt a year earlier in connection with his application for medical assistance. (And I note that during that exam, Dr. Van Pelt expressed the opinion that plaintiff's symptoms would last 12 months which suggests that after those 12 months he perhaps should have considered another examination before completing the Medical Source Statement.) Because there were no further

visits to Dr. Van Pelt, his opinion a year later had to have come from his records of the first and only visit. No tests were done during that visit -- it was nothing more than Dr. Van Pelt observing plaintiff and interviewing him about his symptoms.

Dr. Van Pelt's records show that plaintiff said, "I get nervous; it's not shaking, it's just nervous in my stomach." However, a bit later in the record, Dr. Van Pelt said that plaintiff experiences "trembling and shaking." Dr. Van Pelt did not address this inconsistency.

Dr. Van Pelt found that "[t]here seemed to be no impairment in [plaintiff's] recall and memory abilities," yet he found in the Medical Source Statement that plaintiff was moderately limited in his ability to remember detailed instructions.

In Dr. Van Pelt's summary of the one office visit, he stated that it "appeared" that plaintiff's "perceived" emotional disturbance was sufficient enough to precluding him from "performing an occupation." Dr. Van Pelt never identified any function from which plaintiff was precluded due to his mental condition, and he was careful to call it a "perceived" emotional disturbance.

Despite these few inconsistencies in Dr. Van Pelt's own medical record and his Medical Source Statement, I note bigger problems with plaintiff's suggestion that Dr. Van Pelt's opinion was corroborated by the opinion of Dr. Eva Wilson. Whereas Dr. Van Pelt assessed depressive disorder not otherwise specified (which means the mental disorder appears to fall within the larger category but does not meet the criteria of any specific disorder within that category), Dr. Wilson assessed Major Depression, Severe. Dr. Van Pelt assessed panic disorder with agoraphobia. Dr. Wilson assessed no panic disorder, no agoraphobia. Dr. Van Pelt assessed alcohol dependence in partial remission per patient report; Dr. Wilson was told by plaintiff that he doesn't drink.

40

Turning to the 20 standard mental abilities listed in the Medical Source Statements, I find that Dr. Wilson's and Dr. Van Pelt's opinions are not the same. In the chart below, blue refers to "not significantly limited," green refers to "moderately limited," and red refers to "markedly limited."

| Dr. Van Pelt | Dr. Wilson |
|---|---|
| The ability to remember locations and work-like procedures | The ability to remember locations and work-like procedures |
| The ability to understand and remember very short and simple instructions | The ability to understand and remember very short and simple instructions |
| The ability to understand and remember detailed instructions | The ability to understand and remember detailed instructions |
| The ability to carry out very short and simple instructions | The ability to carry out very short and simple instructions |
| The ability to carry out detailed instructions | The ability to carry out detailed instructions |
| The ability to maintain attention and concentration for extended periods | The ability to maintain attention and concentration for extended periods |
| The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances | The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances |
| The ability to sustain an ordinary routine without special supervision | The ability to sustain an ordinary routine without special supervision |
| The ability to work in coordination with or proximity to others without being distracted by them | The ability to work in coordination with or proximity to others without being distracted by them |
| The ability to make simple work-related decisions | The ability to make simple work-related decisions |
| The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods | The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods |
| The ability to interact appropriately with the general public | The ability to interact appropriately with the general public |

41

| | |
|---|---|
| The ability to ask simple questions or request assistance | The ability to ask simple questions or request assistance |
| The ability to accept instructions and respond appropriately to criticism from supervisors | The ability to accept instructions and respond appropriately to criticism from supervisors |
| The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes | The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes |
| The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness | The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness |
| The ability to respond appropriately to changes in the work setting | The ability to respond appropriately to changes in the work setting |
| The ability to be aware of normal hazards and take appropriate precautions | The ability to be aware of normal hazards and take appropriate precautions |
| The ability to travel in unfamiliar places or use public transportation | The ability to travel in unfamiliar places or use public transportation |
| The ability to set realistic goals or make plans independently of others | The ability to set realistic goals or make plans independently of others |

Where Dr. Van Pelt found that plaintiff was not significantly limited in his ability to maintain attention and concentration, Dr. Wilson found that plaintiff was markedly limited in this area. Where Dr. Van Pelt found that plaintiff was not significantly limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, Dr. Wilson found a marked limitation. Where Dr. Van Pelt found that plaintiff was markedly limited in his ability to interact appropriately with the general public, Dr. Wilson found that plaintiff was not significantly limited. Dr. Van Pelt found that plaintiff was markedly limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; Dr. Wilson believed he was not significantly limited in this area. These two opinions do not corroborate each other.

The opinions of Drs. Van Pelt and Wilson were obtained in connection with plaintiff's applications for government benefits and were based on his subjective reports to them. And the record shows that those subjective reports were not the same.

Plaintiff told Dr. Van Pelt he was suffering from constantly-burning joints in his knees and hips and that his legs tire out quickly and get numb. He told Dr. Wilson he bicycled across town, and he made it to his appointment on time.

Plaintiff told Dr. Van Pelt that if he had a gun, he would probably blow his head off. He told Dr. Wilson that had no active plan for suicide.

Plaintiff told Dr. Van Pelt that he has recurrent, unexpected panic attacks and that he lives with a persistent concern about having an additional panic attack and he is worried about the implications of the panic attack and its consequences and that his panic attacks have caused a significant change in his behavior. He never mentioned panic attacks to Dr. Wilson -- or to his treating doctor.

Plaintiff told Dr. Van Pelt that he had a normal childhood. He told Dr. Wilson that he was in family therapy as a child due to four or five family member suicides and the suicidal ideation of his mother.

Plaintiff told Dr. Van Pelt that he uses alcohol two or three times a week and that he drinks to get relaxed. He told Dr. Wilson that he doesn't drink.

Dr. Wilson's opinion does not corroborate Dr. Van Pelt's opinion.

The ALJ found that plaintiff was limited to minimal contact with the public, co-workers, and supervisors. The only "marked" limitations found by Dr. Van Pelt were in the ability to interact appropriately with the general public and the ability to get along with coworkers or peers. Therefore, the medical opinion that plaintiff claims the ALJ should have adopted

actually is incorporated in the ALJ's residual functional capacity assessment, despite the ALJ having said that "Dr. [Van] Pelt's opinions were accorded very little weight".

IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.   Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 16, 2013

44